IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 2, 2015

**STATE OF TENNESSEE v. BRUCE MARVIN VANN**

**Appeal from the Circuit Court for Madison County
No. 13-681     Donald H. Allen, Judge**

---

**No. W2014-02119-CCA-R3-CD  -  Filed August 28, 2015**

---

The Defendant, Bruce Marvin Vann, was indicted and, following a jury trial, convicted of three counts of rape of a child.  See Tenn. Code Ann. § 39-13-522.  The trial court imposed sentences of thirty-five years for each conviction and ordered the sentences to run concurrently, for a total effective sentence of thirty-five years to be served at 100 percent.  On appeal, the Defendant contends (1) that the evidence was insufficient to sustain his convictions; and (2) that the prosecutor committed misconduct during his closing argument.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

George Morton Googe, District Public Defender; and Gregory D. Gookin, Assistant District Public Defender (at trial and on appeal), for the appellant, Bruce Marvin Vann.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; James G. Woodall, District Attorney General; and Brian M. Gilliam, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

The evidence at trial established that the victim, D.H.,[1] was eleven years old on August 31, 2013, and the Defendant was her step-father.  The victim lived with the Defendant, her mother, and her three brothers.  D.H.'s mother would work nights while

---

[1] It is the policy of this court to protect the privacy of minors and of victims of sexual offenses by referring to them by their initials.

the Defendant stayed at home with the children. D.H.'s brothers shared a bedroom, the Defendant and her mother shared the other bedroom, and D.H. would sleep on a daybed in the living room.

D.H. testified at trial that on August 31, 2013, the Defendant woke her up and took her to his bedroom. Once the Defendant shut the door, he touched the outside and inside of her "private part" with his fingers and his tongue. The Defendant then put his "private part" inside her "private part." D.H. testified that the Defendant did not threaten her, but he did hold her down during the attack. When he was finished, the Defendant took a shower. D.H. testified that she stayed in the bedroom for a few minutes and went back to the living room while the Defendant was showering. D.H. further testified that she thought her brothers were asleep and that she did not "call out for" them while the Defendant was raping her.

D.H. admitted that she did not tell her mother what happened when she returned home from work at approximately 6:00 a.m. the next morning. D.H. went to school like normal that Monday without telling anyone about what had happened. All the while, the Defendant remained in the house with D.H. and her family. At some point, a relative D.H. referred to as "Uncle Ronnie" came from Nashville to stay with D.H. and her family for a few days.

One morning while "Uncle Ronnie" was staying with them, D.H. and her mother got into an argument over how D.H. would wear her hair to school. After her mother left for work, D.H. wrote a note and gave it to "Uncle Ronnie" with instructions that he give it to her mother. The note stated as follows, "Ok let's see will [believe] me on this[,] [the Defendant,] you so called man[,] f--ked in your bed. Do you [believe] me [now]? And it was when you went to work." D.H. admitted that she was mad at her mother when she wrote the note but denied that she wrote it to hurt her mother's feelings. D.H. testified that she was trying to tell her mother that the Defendant had sex with her but admitted that the note did not say anything about the Defendant touching or raping her.

D.H. testified that when she got home from school that day, the Defendant was still at her house, but her mother took her to a relative's house. The next day, her mother took D.H. to the emergency room, and they went back to their house after she had been examined. D.H. testified that when they returned from the emergency room, the Defendant was still at the house. D.H. testified that she eventually spoke to Monica Goodman, a forensic interviewer, at the Child Advocacy Center in Jackson. D.H.'s conversation with Ms. Goodman was recorded and played for the jury at trial.

When Ms. Goodman asked D.H. why she was there, she responded that it was because her mother wanted to know if she was telling the truth about the Defendant. D.H. told Ms. Goodman that on August 31, 2013, the Defendant had woken her up after

her mother left for work. The Defendant told D.H. to go to the bathroom, but instead of taking her to the bathroom, he took her into his bedroom. D.H. stated that she thought her brothers were asleep while this happened. D.H. recalled that the Defendant was wearing red and black shorts.

D.H. told Ms. Goodman that, once they were in the bedroom, the Defendant pulled down his shorts and took off her clothes. The Defendant laid her down on the bed and stood over her. D.H. stated that the Defendant put his finger inside her "private part" and held her arms down with his other hand. D.H. also stated that the Defendant kissed her and put his tongue in her mouth as he did this. After he took his finger out, the Defendant knelt down in front of D.H and started licking and putting his tongue inside her "private part." D.H. told Ms. Goodman that "it kinda hurted" while the Defendant was licking her.

D.H. stated that the Defendant then stood up and pulled her to the edge of the bed. D.H. told Ms. Goodman that she was lying on her back and that the Defendant put his "private part" inside of her, started moving back and forth, and told her to stop moving. D.H. stated that it felt "watery" and "hurted" when the Defendant did this. D.H. told Ms. Goodman that the Defendant then tried to make her put his "private part" in her mouth. D.H. stated that the Defendant sat her up and told her to bend down and put his penis in her mouth, but she refused.

D.H. stated that when she refused to put the Defendant's "private part" in her mouth, he told her not to tell anyone about what happened and to go back to bed. D.H. told Ms. Goodman that the Defendant took a shower after he was finished and that she went back to her bed and pulled the covers over her head. D.H. stated that she did not tell anyone about what the Defendant had done for a few days but that she wrote a note and had her "Uncle Ronnie" give it to her mother. D.H. admitted that the note did not really say what the Defendant had done to her. D.H. told Ms. Goodman that the Defendant had never done anything like this "or different" to her before.

On cross-examination at trial, D.H. admitted that, several months before this incident, she had given a note to one of her teachers that said the Defendant had sex with her. D.H. also told one of her friends the same thing. D.H. admitted that what she told her teacher and friend was not true at the time. D.H. testified that the Defendant had been touching her chest and "bottom," that she hated the Defendant for touching her, and that she had lied to her teacher and friend because she wanted the Defendant "out of the house" because of the touching. D.H. testified that after giving the note to her teacher, she was interviewed by a different woman at the Child Advocacy Center and told her that nothing had happened. D.H. said that she did not know why she did not tell the interviewer about the Defendant touching her.

-3-

Ronnie Hampton testified that he lived in Nashville and was related to D.H. and her mother.[2] Mr. Hampton testified that shortly after August 31, 2013, he stayed at the victim's house for few days "in one of the kid's bedroom." Mr. Hampton recalled that, one morning, D.H. and her mother got into an argument "about fixing" the victim's hair. After D.H.'s mother left for work, D.H. brought Mr. Hampton a note. Mr. Hampton testified that the victim seemed normal when she gave him the note. Mr. Hampton read the note after D.H. left for school and then called D.H.'s mother to tell her about the note.

Mr. Hampton testified that the Defendant was asleep in another room and that he did not tell him about the note. According to Mr. Hampton, D.H.'s mother came home, and he gave her the note. Mr. Hampton admitted that he had earlier told the police that, after he read the note, he gave it to the Defendant. Mr. Hampton also admitted that he told the police that, after reading the note, he initially told D.H.'s mother that D.H. needed a "whipping." Mr. Hampton explained that when he first read the note, he thought D.H. "was being disobedient."

Doctor Elly Riley testified that she specialized in family medicine and that she saw D.H. on September 5, 2013. Dr. Riley recalled that D.H. was brought in by her mother because she "wanted [Dr. Riley] to tell her if [D.H.] had had sex." Dr. Riley testified that she spoke to D.H. alone and that D.H. seemed depressed. According to Dr. Riley, D.H. said that the Defendant "had come into her room and touched her." Dr. Riley asked D.H. some more detailed questions, and D.H. told her that the Defendant had touched her "privates" with his fingers and penis. Dr. Riley determined "that there was no utility in doing a rape kit" because too many days had passed since when D.H. said it happened. Dr. Riley testified that she asked D.H. if the Defendant had ever done anything like that before and that D.H. said that he had not.

Dr. Riley performed a gynecological exam on D.H. and tested her for sexually transmitted diseases. Dr. Riley testified that D.H. had "a large amount" of "a creamy white [discharge] that [was] thick from [her] vagina." Further testing confirmed that D.H. had trichomoniasis. Dr. Riley explained that trichomoniasis is a "sexually transmitted protozoan infection" that can cause vaginal discharge and irritation. Dr. Riley testified that the only way she knew that a female could contract trichomoniasis was through vaginal intercourse. Dr. Riley opined that a person infected with trichomoniasis would become symptomatic within a few days of infection.

The Defendant was taken to the Jackson-Madison County General Hospital emergency room where Kate Cepparulo, a nurse practitioner, tested him for trichomoniasis. Ms. Cepparulo testified that the Defendant tested positive for

---

[2] It is unclear from the testimony at trial exactly how Mr. Hampton is related to the victim and her mother.

trichomoniasis. Ms. Cepparulo further testified that sexual contact was the only way she knew trichomoniasis to be transmitted. The Defendant entered into evidence a set of discharge instructions from the hospital regarding trichomoniasis that stated it could be contracted from "swimming pools or hot tubs."

D.H.'s mother, T.H.,[3] testified that around September 4, 2013, she had a fight with the victim before she left for work. T.H. testified that the Defendant called her while she was on her way to work and told her about the note from the victim. T.H. recalled that when she got home, the Defendant gave her the note and told her that D.H. "needed an ass whipping." T.H. also recalled that Mr. Hampton told her that he had given the note to the Defendant. T.H. testified that when she read the note, she thought it meant that the victim had woken up in the middle of the night and discovered the Defendant with another woman.

T.H. testified that D.H. had said that the Defendant "had messed with her before." T.H. confronted the victim about the note when she got home from school, but T.H. claimed that the victim would not tell her anything about the note. T.H. took the victim to a relative's house for the night, where the victim told the relative that the Defendant "was messing with her." T.H. took D.H. to see Dr. Riley the next day because she wanted to know if D.H. was telling the truth. T.H. testified that she and the victim went back home and stayed with the Defendant after they had seen Dr. Riley. According to T.H., the police came to her work to talk about the victim a few days later. T.H. testified that she also tested positive for trichomoniasis.

The Defendant's sister, Geraldine Ware, testified that T.H. showed up at her house one day with a police officer and showed her the note from D.H. Ms. Ware claimed that T.H., the victim, and the Defendant pulled up together in the same car. Ms. Ware also claimed that she went with T.H. and the victim to the emergency room. According to Ms. Ware, the doctor said that D.H. "hadn't been messed with" because she "was still intact." Ms. Ware further claimed that T.H. and the victim went back to her house after visiting the emergency room and that T.H. was relieved that the victim had not been raped. Ms. Ware admitted that, until the trial, she was unaware that the victim had been diagnosed with trichomoniasis.

The Defendant denied that he ever had any sexual contact with D.H. The Defendant testified that he lived with D.H. until he was arrested on September 6, 2013. The Defendant further testified that he was still married to T.H. at the time of the trial. The Defendant claimed that there was nothing out of the ordinary about August 31, 2013. The Defendant testified that all of the kids went to bed as usual and that he went to bed

---

[3] In order to further protect the victim's privacy, we will refer to her mother by her initials.

"and that was the end of it." The Defendant also claimed that D.H. did not act "strangely" around him until she gave Mr. Hampton the note.

The Defendant claimed that he read the note, called T.H., and told her that "she needed to come home [because] her child had [written] another letter." The Defendant testified that he also told T.H. that she needed to "whip [the victim's] ass." The Defendant explained that he said this "[b]ecause that was the second time [D.H.] had" written a note about him. The Defendant complained that the victim did not "get disciplined." The Defendant testified that he used to discipline the children but that he stopped because T.H. "wasn't standing behind" him about it. The Defendant opined that D.H. lied about him because "she didn't want [him] at the house."

The Defendant testified that he gave the note to T.H. when she got home and that she left and picked the victim up early from school. The Defendant further testified that he did not go with T.H. and the victim when they went to see Dr. Riley. The Defendant claimed that he went with the victim and T.H. to Ms. Ware's house and that the police were "down the street" while T.H. spoke to Ms. Ware. The Defendant testified that he gave the note to the police. The Defendant claimed that after the victim saw Dr. Riley, T.H. told him he needed to be tested for trichomoniasis. The Defendant further claimed that he was shocked when he tested positive for trichomoniasis and that he did not know how he contracted the disease.

Based upon the foregoing evidence, the jury convicted the Defendant of three counts of rape of a child: one conviction for the Defendant's penetration of the victim's vagina with his fingers, one conviction for the Defendant's penetration of the victim's vagina with his tongue, and one conviction for the Defendant's penetration of the victim's vagina with his penis. Following a sentencing hearing, the trial court sentenced the Defendant to thirty-five years for each conviction and ordered the sentences to run concurrently, for an effective sentence of thirty-five years to be served at 100 percent. This appeal followed.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions. The Defendant argues that D.H.'s credibility was questionable and that her questionable credibility, "coupled with [his] denial of the allegations," amounts to insufficient evidence. The State responds that the evidence was sufficient to sustain the Defendant's convictions.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (internal quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

Here, D.H. testified at trial that the Defendant penetrated her vagina three separate times with his fingers, tongue, and penis. This court has previously held that a victim's uncorroborated testimony "constitutes sufficient evidence" even in the face of a defendant's denial. State v. James Vanover, No. E2005-01192-CCA-R3-CD, 2006 WL 521496, at *4 (Tenn. Crim. App. Mar. 2, 2006). Furthermore, Dr. Riley testified that when she saw the victim on September 5, 2013, the victim presented with "a large amount" of vaginal discharge and was diagnosed with trichomoniasis. The Defendant and D.H.'s mother were also subsequently diagnosed with trichomoniasis.

The fact that the jury accredited D.H.'s testimony and chose not to believe the testimony of the Defendant and his witnesses "does not cause its verdict to be suspect." State v. Leath, 461 S.W.3d 73, 104 (Tenn. Crim. App. 2013). Questions regarding the credibility of the witnesses are the province of the jury and will not be revisited by this court. Bland, 958 S.W.2d at 659. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's convictions.

## II. Closing Argument

The Defendant contends that the prosecutor committed misconduct during his closing argument. The Defendant argues that the prosecutor made several statements designed only "to elicit sympathy for the alleged victim, rather than addressing the evidence produced at trial." The State responds that the Defendant has waived appellate review with respect to two of the three challenged statements because he did not contemporaneously object to them or include them in his motion for new trial. With respect to the remaining statement, the State responds that it did not "exceed the bounds of propriety" and that any error was ultimately harmless given the overwhelming evidence against the Defendant.

In his brief on appeal, the Defendant cites to three specific statements made by the prosecutor during his closing argument. The first is as follows:

I mean, I even feel uncomfortable talking about an [eleven] year old girl and having to ask doctors about this [eleven] year old girl's vagina. As a

grown man - - even in this role, it's creepy just to talk about an [eleven] year old girl's private parts.

The Defendant did not object to this statement.

The next statement the Defendant objects to is as follows:

She's [eleven] years old. She watches cartoons. She sleeps on a daybed in the living room. She's asking for justice. I'm asking on her behalf for you to give her justice. I can't give it to her. You're the only ones that can give her justice. This girl has got to live with this for the rest of her life. I know most of you said that you've never known anybody who had been sexually abused or anything like that, but think about the burden this girl now has to carry with her for the rest of her life.

The Defendant objected to this statement, and the trial court overruled the objection and did not give any curative instructions to the jury.

The next statement was made immediately after the Defendant's objection and is as follows:

For the rest of her life, it's awkward enough when people talk about their first sexual experience. I mean, if you're thinking about your first sexual experience, it may be something embarrassing or could be something awkward. For [D.H.], whenever she thinks about her first sexual experience for the rest of her life, she's got to think about the time she was held down on her momma's bed, against her will forced to have sex with her step-dad and to boot he infects her with a sexually transmitted disease.

The Defendant did not object to this statement.

*A. Statements the Defendant Did Not Object To*

As stated above, the Defendant did not object to the first and third statements and did not raise them in his motion for new trial; therefore, he has waived full appellate review of the statements. See Tenn. R. App. P. 3(e), 36(a) (stating that full appellate review is waived when a party fails to contemporaneously object to an error or raise it in a motion for new trial). As such, we review these statements only to determine if plain error review is warranted. The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Plain error review is not warranted here because the record does not clearly establish what occurred in the trial court. Page, 184 S.W.3d at 230. In reviewing the propriety of a prosecutor's closing argument, this court considers "the curative measures undertaken by the trial court." State v. Banks, 271 S.W.3d 90, 131 (Tenn. 2008). The Defendant failed to include a copy of the jury instructions in the appellate record; therefore, the record is incomplete as to whether the trial court instructed the jury regarding how it was to consider the attorneys' closing arguments. As the record is incomplete, we conclude that plain error review is not warranted with respect to the first and last challenged statements.

## B. The Statement Objected to at Trial

Closing arguments "have special importance in the adversarial process," and the parties "have an ancient right to make closing arguments." Banks, 271 S.W.3d at 130. Closing arguments allow the parties "to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." Id. Attorneys "should be given great latitude in both the style and the substance of their arguments." Id. at 131. This leeway often results in closing arguments in criminal cases having a "rough and tumble quality" to them. Id. (quoting State v. Skakel, 888 A.2d 985, 1060-61 (Conn. 2006)). However, while attorneys "may strike hard blows, . . . [they are] not at liberty to strike foul ones." Id. (quoting Berger v. United States, 295 U.S. 78, 88 (1935)).

"[A] prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." Banks, 271 S.W.3d at 131. This court has found five general areas of prosecutorial misconduct with respect to closing arguments, the only one of which at issue in this case, is that the "prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury." State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citing Standards Relating to the Prosecution Function and the Defense Function §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)).

"A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." Banks, 271 S.W.3d at 131. Instead, an improper closing argument that does not rise to the level of a constitutional violation "will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." Id.; State v. Jackson, 444 S.W.35 554, 591 n.1 (Tenn. 2014). In reviewing such an allegedly improper prosecutorial argument, this court considers:

> (1) the conduct complained of, viewed in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

Jackson, 444 S.W.3d at 591 n.50.

Prosecutors "may risk reversal by engaging in argument which appeals to the emotions and sympathies of the jury." State v. Cribbs, 967 S.W.2d 773, 786 (Tenn. 1998). Here, we hold that the prosecutor's repeated calls for the jury to give the victim justice and to think about "the burden this girl now has to carry . . . for the rest of her life" were improper. See State v. Bigbee, 885 S.W.2d 797, 808-09 (Tenn. 1994) (holding that "the State's argument to the jury about the victim . . . and suggesting that holding the defendant accountable was a way to do justice" was error, but ultimately harmless), superseded by statute on other grounds as stated in State v. Odom, 137 S.W.3d 572, 580-81 (Tenn. 2004); State v. Jerry W. Tullos, No. E2006-01833-CCA-R3-CD, 2007 WL 2377354, at *8 (Tenn. Crim. App. Aug. 21, 2007) (holding that "it was improper for the prosecutor to interject ideas of justice and deterrence in his closing argument," but was ultimately harmless), perm. app. denied (Tenn. Feb. 4, 2008).

However, in light of the facts and circumstances of the case and the strength of the State's case, we conclude that the prosecutor's improper remarks were ultimately harmless. D.H. testified at trial that the Defendant penetrated her vagina with his fingers, tongue, and penis on the night of August 31, 2013. D.H.'s testimony at trial was similar to what she told Ms. Goodman during her forensic interview at the Child Advocacy Center. Furthermore, Dr. Riley diagnosed D.H. as suffering from trichomoniasis on September 5, 2013. The Defendant was subsequently diagnosed with the same sexually transmitted disease. Given the overwhelming nature of the evidence against the Defendant, we cannot conclude that the prosecutor's improper remarks were so inflammatory or improper that they affected the outcome of the trial to the Defendant's prejudice.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE